**In re Ralph RIEDER, Debtor.**

**In re FELLOW, READ & ASSOCIATES, INC., Plaintiff,**

**v.**

**Ralph RIEDER, Defendant.**

**Bankruptcy No. 91 B 15260 (SMB).**
**Adv. No. 92–8745A.**

United States Bankruptcy Court,
S.D. New York.

Feb. 28, 1995.

Hecker, Brown, Sherry & Johnson, (Richard Ford Wells, of counsel), Camden, NJ, for plaintiff.

Siegel, Sommers & Schwartz (Ronald R. Sussman, Eric Haber, of counsel), New York City, for defendant.

## MEMORANDUM DECISION DISMISSING COMPLAINT SEEKING DETERMINATION OF DISCHARGEABILITY OF DEBT

STUART M. BERNSTEIN, Bankruptcy Judge.

Fellows, Read & Associates, Inc. (the "Plaintiff") seeks a determination that three debt obligations of Ralph Rieder (the "Debtor"), embodied in three guarantees delivered to the Plaintiff in 1989, are not dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). On December 15, 1994, the Court conducted a trial, and three witnesses testified. As more fully set forth below, the Plaintiff failed at trial to demonstrate that it relied upon the Debtor's guarantees, or that it suffered any damages as a proximate result of the delivery of the guarantees.[1] Consequently, the complaint is dismissed.[2]

### FACTS

At all relevant times, the Plaintiff provided civil engineering services to persons and entities involved in the business of, *inter alia,* land development. The Debtor was a shareholder and officer of Riedhal, Inc., a real estate developer doing business in New Jersey. In 1987, two years prior to the events in question, the Plaintiff and Riedhal entered into three agreements (*see* Plaintiff's Exhibit 5) under which the Plaintiff agreed to prepare preliminary and final plans and applications for approval of three separate projects—Edinburg Estates, American Boss and Livingston Parkway—which Riedhal was seeking to develop. Each contract established a payment schedule and entitled the Plaintiff to stop rendering services on that project if it was not paid. By the summer of 1989, Riedhal had fallen behind in paying its debt to the Plaintiff, and owed the Plaintiff the aggregate sum of $184,439.12 on the three projects.

On or about September 13, 1989, the Plaintiff's president, Joseph R. Read, met with Riedhal's Vice President and Chief Financial Officer, George Karasick, to work out a payment schedule for the outstanding debt. The Plaintiff refused to proceed with any further work absent a payout agreement. Read and Karasick eventually agreed that the debt would be paid over a three month period in essentially three equal parts pursuant to terms set forth in three separate promissory notes. Riedhal was to sign each of the notes along with R.K. & Drucker U.S.A, Inc. ("Drucker"), a prospective merger partner of Riedhal. In addition, Read insisted that the notes be "personally endorsed by the appropriate [corporate] officials." (Plaintiff's Exhibit 6.)

By October 11, 1989, Read had still not received the notes. He wrote to the Debtor on that day[3] and advised him that if he did not receive the properly executed notes by October 13, 1989, the Plaintiff would withdraw the payout proposal, demand payment of the entire outstanding balance and refuse to attend or testify at the Washington Township Planning Board hearing scheduled for October 18, 1989. (Plaintiff's Exhibit 7.) Washington Township had jurisdiction over the American Boss Project, but apparently had no jurisdiction over the other two projects. (*See* Plaintiff's Exhibit 6 at 1.)

The letter produced the intended result. Shortly thereafter, the Plaintiff received the three notes, *dated September 13, 1989,* in the sums of $63,618.98, $63,060.67 and $63,613.28, due November 30, 1989, December 31, 1989 and January 31, 1990, respectively. All three notes were made by Riedhal and Drucker,

---

1. In its post-trial reply brief, the Plaintiff attached certain documents not offered at trial, and made arguments based on these documents. This was improper, and the Court has not considered this evidence or the related arguments.

2. The Plaintiff also sought a money judgment against the Debtor. This is a no asset estate, however, and the Court declines to enter a money judgment on the contract claim arising from the breach of the guarantee. The Plaintiff is nevertheless free to file proof of such a claim with the clerk.

3. Prior to the October 11 letter, Read dealt with Karasick regarding the payout. He did not explain at trial why he wrote to the debtor instead of Karasick.

and personally guaranteed by the Debtor. (*See* Plaintiff's Exhibits 1–3.)

After receiving the guaranteed promissory notes, the Plaintiff attended the single planning board meeting, and also rendered some services on the other two projects. The Plaintiff stopped doing any work once Riedhal and Drucker defaulted, and after the Debtor filed his case, the Plaintiff sought a determination that the guaranteed debt was not dischargeable.

## DISCUSSION

### A. Introduction

The parties do not dispute that the Plaintiff holds a contract claim against the Debtor based upon the guarantees. That contract claim, however, is dischargeable. Instead, the Plaintiff contends that the delivery of the guarantees also constituted an implied representation that the Debtor had the financial wherewithal to pay the guarantees if called upon to do so, that this implied representation was false, and the Debtor knew or should have known that he would be financially unable to pay the guarantees. The Plaintiff claims that it relied upon this representation, primarily by preparing for and attending the planning board meeting. Finally, the Plaintiff alleges that it suffered damages in the full amount of the aggregate guarantees as a result of its reliance upon the Debtor's fraudulent misrepresentation.

■■■ Section 523(a)(2)(A) excepts from discharge any debt for money, property or services "to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's ... financial condition." A party proceeding under this subsection must establish five elements: (1) a representation, (2) falsity, (3) scienter, (4) reasonable or justifiable reliance and (5) damage. *Kovitz v. Tes-*

*metges (In re Tesmetges)*, 74 B.R. 911, 914 (Bankr.E.D.N.Y.1987), *aff'd*, 86 B.R. 21 (E.D.N.Y.), *aff'd without op.*, 862 F.2d 304 (2d Cir.1988). The proponent must prove each element by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 290, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991); *New York v. Sokol (In re Sokol)*, 170 B.R. 556, 560 (Bankr.S.D.N.Y.1994). Exceptions to discharge must be literally and strictly construed against the creditor and liberally in favor of the debtor. *Community Mutual Savings Bank v. Landrin (In re Landrin)*, 173 B.R. 307, 310 (Bankr.S.D.N.Y.1994); *First Am. Bank v. Bodenstein (In re Bodenstein)*, 168 B.R. 23, 27 (Bankr.E.D.N.Y.1994); *Schwalbe v. Gans (In re Gans)*, 75 B.R. 474, 481 (Bankr.S.D.N.Y.1987).

### B. Representation

■■■ The parties strongly dispute the nature of the representation that a guarantor makes when he executes and delivers a guarantee. As a rule, one who undertakes to perform an obligation, such as to pay a debt, impliedly represents that he intends to perform. Restatement (Second) of Torts § 530, Comment c (1977); *see Manufacturers Hanover Trust Co. v. Pannell (In re Pannell)*, 27 B.R. 298, 302 (Bankr.E.D.N.Y.1983) (quoting *Channel Master Corp. v. Aluminium Ltd. Sales, Inc.*, 4 N.Y.2d 403, 407, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958)). The Plaintiff contends that the Debtor impliedly misrepresented his financial ability to perform his obligation, and this constitutes fraud.[4] *See In re Gans*, 75 B.R. at 486.

The Debtor counters with an argument he fails to support. He contends that a guarantor does not represent his ability to perform. Instead, the guarantor simply represents that he will subject whatever assets he has to the payment of the guarantee, but does not represent that he has those assets.

---

4. The Plaintiff did not try this case on the theory that the Debtor misrepresented his intention to perform, although the intention to perform and the ability to perform are closely related. Nevertheless, the Plaintiff's theory of the case comes dangerously close to being self-defeating. Dischargeability proceedings grounded on false representations of financial condition must proceed under § 523(a)(2)(B), and require a writing. *See*

*Schwalbe v. Gans (In re Gans)*, 75 B.R. 474, 484–85 (Bankr.S.D.N.Y.1987); *Seepes v. Schwartz (In re Schwartz)*, 45 B.R. 354, 356–57 (Bankr. S.D.N.Y.1985); *In re Kiernan*, 17 B.R. 362, 365 (Bankr.S.D.N.Y.1982). This may be why such cases proceed on a "misrepresentation of intention" rather than a "misrepresentation of financial ability" theory. In light of the Court's ultimate disposition, it need not resolve the issue.

■ The Court sees no basis to distinguish guarantees from other contractual promises. Accordingly, one who undertakes to guarantee a debt impliedly represents that he intends to perform his obligation if called upon to do so. The guarantee is a promise, and assuming the existence of the other elements of the fraud claim, one who knowingly delivers a guarantee he cannot pay commits actionable fraud. Hence, the Plaintiff proved the first element of its fraud claim.

## C. Falsity and Scienter

■ The implied representation of financial ability was false, and the Debtor knew it. The elements of falsity and scienter overlap in this case. Proof of the Debtor's knowledge of his inability to perform demonstrates both the falsity of his implied representation as well as his knowledge of that falsity. In this regard, few admit to fraudulent intent, and the Court must divine fraudulent intent from the totality of the circumstances. *In re Gans,* 75 B.R. at 486. *See Cordeiro v. McDermott (In re McDermott),* 139 B.R. 50, 52 (Bankr.D.R.I.1992).

The evidence compels a finding that the Debtor knew when he signed the guarantees that he would not be able to honor them. The Debtor admitted in his supplemental answers to the Plaintiff's interrogatories that he lacked the financial ability to pay the guarantees when he delivered them and when they became due. Although he testified that he *anticipated* cash flow from other sources or projects to pay the approximate $184,000.00 obligation over the three month payout, his assumptions were speculative, and never panned out. Further, Riedhal was already several months behind in paying the Plaintiff, and there was no objective basis to believe that the situation would change during the next three months.

Finally, the Debtor claimed in his post-trial memorandum, at page 7, that the Plaintiff could not have reasonably relied on any representation by the Debtor because the Plaintiff was "certainly aware that a real estate developer such as Defendant could be at substantial risk during the period when the real estate market was in a depressed condition."[5] If the Plaintiff should have anticipated this "substantial risk," *a fortiori,* the Debtor, a real estate developer, should have foreseen it. Accordingly, the Plaintiff proved the second and third elements of its claim.

## D. Reasonable Reliance

The Plaintiff failed, however, to prove that it actually or reasonably relied on the Debtor's representation of his financial ability to perform. Mr. Read's testimony indicates that the Plaintiff was concerned that Riedhal might be stripped of assets, and that the Plaintiff would only hold a claim against a corporate shell:

Q: Why was the personal guarantee of Ralph Rieder included on the notes?

A: Because I asked for it and demanded it as part of the agreement.

Q: Why was that important to you?

A: Because I'm never sure with development corporations whether they will merge, spin off or consolidate with some other corporation and leave no assets in the corporation.

So whenever possible we would take as a Promissory Note a personal guarantee from the principal and the corporation to forestall any problems later on.

(Tr. at 31–32.)[6]

Mr. Read subsequently testified:

Q: What did the personal guarantee of Ralph Rieder mean to you as President of Fellows, Read & Associates?

. . . .

A: The significance of Mr. Rieder's signature was that it was a personal guarantee of the obligation that if the corporation or corporations on the notes didn't pay

5. This is an extraordinary statement by the Debtor. At the time he executed the guarantees, he already had $90 million in personal guarantees outstanding. Any dip in the already depressed market would send him hurtling toward irreversible insolvency.

6. "Tr." refers to the transcript of the December 5, 1994 trial.

them I had the *ability to look* to Mr. Rieder personally to pay them.

(Tr. at 37–38) (emphasis added.)

■ The Court finds from this testimony that the Plaintiff was not relying upon Rieder's financial ability to pay the notes in the event of a default. Instead, the Plaintiff feared a stripping of Riedhal's assets, and accepted the guarantees with the expectation that he could sue the Debtor if they were not paid. The distinction, though subtle, is important. The maker of a false representation is not liable for fraud to one who does not rely on its truth, but rather, upon the expectation that the maker will be liable for damages. Restatement (Second) of Torts § 548 and Comment a (1977). Read demanded a personal guarantee to give the Plaintiff the "ability to look" to the Debtor for payment, and not because he necessarily believed that the Debtor had the ability to pay the debt. As a consequence, the Plaintiff failed to prove that it actually relied upon the Debtor's implied representation of financial ability.

■ Further, the Plaintiff failed to prove that it was reasonable to rely upon an implied representation of financial ability. At the outset, the parties dispute whether "reasonable" reliance—as opposed to any reliance—is an element of a claim under § 523(a)(2)(A). The law in this district and circuit, however, requires that the reliance must be reasonable. *See, e.g., Bethpage Fed. Credit Union v. Mickel (In re Mickel)*, 164 B.R. 456, 461 (Bankr.E.D.N.Y.1994); *Hawkins Bros., Inc. v. Hesston Credit Corp. (In re Hawkins)*, 1992 WL 381040 at *9 (Bankr. D.Vt. Dec. 11, 1992); *Allstate Life Ins. Co. v. Guerrerio (In re Guerrerio)*, 143 B.R. 605, 611 (Bankr.S.D.N.Y.1992); *Citibank, N.A. v. Wiener (In re Wiener)*, 144 B.R. 17, 21 (Bankr.E.D.N.Y.1992); *Farina v. Balzano*

*(In re Balzano)*, 127 B.R. 524, 530 (Bankr. E.D.N.Y.1991); *In re Tesmetges*, 74 B.R. at 914; *In re Esposito*, 44 B.R. 817, 824 (Bankr. S.D.N.Y.1984).[7] This requirement also comports with the common law of fraud. *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970–71 (2d Cir.1987); Restatement (Second) of Torts § 537(b) (1977); William L. Prosser, *Law of Torts* § 108, at 715 (4th ed. 1971). *See Hirsch v. Enright Refining Co.*, 751 F.2d 628, 632–33 (3d Cir.1984) (noting that the New Jersey law was "not entirely clear", but that the general rule in the United States requires "that reliance must be justified.")

■ "Reasonableness" depends on the circumstances, and often "imposes a duty on the plaintiff to make at least a reasonable inquiry as to the validity of the alleged representations made by the defendant-debtor." *In re Tesmetges*, 74 B.R. at 916; *accord In re Wiener*, 144 B.R. at 21. The Court does not suggest that a creditor must inquire beyond the debtor's express representations of financial ability (or intention) to perform when nothing has been brought to the creditor's attention indicating that those representations are false. On the other hand, where no express representations are made, and the creditor does not have any basis to assume the truth of the implied representations, reliance without inquiry is not reasonable.

Such is the case here. The Plaintiff demanded the Debtor's guarantees without speaking to him. By that time, Riedhal was already several months in default. (Tr. at 53.) The Debtor did not discuss the guarantees with Read, or make any other representations regarding his financial ability to pay them. Further, the Plaintiff did not discuss the Debtor's financial ability, or that of the corporate makers, with anyone else. Apparently content to rely on the Debtor's reputation as a "large" real estate developer (Tr. at

<hr>

7. The Southern District case law that the plaintiff cites does not support the contrary proposition. In *Hong Kong Deposit & Guaranty Co. v. Shaheen (In re Shaheen)*, 111 B.R. 48 (S.D.N.Y.1990), the district court affirmed a bankruptcy court judgment declaring a debt non-dischargeable under § 523(a)(2)(A). Although the district court did not refer to "reasonableness" when summarizing the five elements of fraud, *id.* at 51, the district court discussed the "reasonableness" require-

ment as an element of the claim, and concluded that the bankruptcy court's finding that the creditor's reliance was reasonable was not clearly erroneous. *Id.* at 53. In *Smith v. Meyers (In re Schwartz & Meyers)*, 130 B.R. 416 (Bankr. S.D.N.Y.1991), Bankruptcy Judge Brozman reviewed the split in authority but found it unnecessary to resolve the issue, concluding instead that the creditor had failed to demonstrate actual reliance. *Id.* at 426.

36–37), Mr. Read demanded guarantees, proscribed their format and accepted them without inquiry or question.

Mr. Read, a sophisticated supplier of engineering services to land developers, got exactly what he demanded. He neither received nor had any information to form a reasonable basis to believe that the Debtor would be able to pay $184,000.00 over the succeeding three months when Riedhal had failed to pay this same debt over the several preceding months. He could have asked, he should have asked, but he didn't ask, about the Debtor's financial wherewithal, and it was unreasonable for him under the circumstances to rely upon the mere delivery of the guarantees as a representation by the Debtor that he had the financial ability to honor them.

### E. Damages

The Plaintiff also failed to prove that it suffered any damages in reliance on the guarantees, much less damages equal to the entire amount of the guaranteed obligation. The Plaintiff does not claim that the underlying contractual debt for past services, which the Debtor guaranteed as part of a workout after the services were rendered, is not dischargeable. In addition, the Plaintiff did not prove the value of the additional services that it rendered after receiving the guarantees. Mr. Read testified that after he received the notes and before the default, the Plaintiff prepared for and attended a planning board meeting in connection with one of the projects, and continued working on the other two projects. (Tr. at 42–43.) He failed to quantify these services, except to state that attendance at the planning board involved a "very small percentage" of the Plaintiff's overall efforts. (Tr. at 56.) [8]

Instead, the Plaintiff relies upon a *quantum meruit* theory, arguing that Riedhal (and the Debtor) got the benefit of all of these services *after* the guarantee, and the

debt covering these services is, therefore, not dischargeable. Mr. Read testified at trial that the engineer's attendance at the planning board meeting, and the planning board's approval, represent the culmination of all of the engineer's work. (Tr. at 30.) Further, state licensing laws prevent any other engineer from signing the Plaintiff's plans or presenting them to the planning board. (Tr. at 49.) Hence, Riedhal and the Debtor received the full value of these accumulated services when the Plaintiff testified before the planning board on October 18, 1989, and this post-guarantee benefit satisfies the proximate cause requirement.

The Plaintiff's damage theory suffers from numerous factual and legal shortcomings. First, Riedhal and the Debtor did not receive the benefit of all of the prior work on the three projects merely because the Plaintiff attended one planning board meeting relating to one project. The Plaintiff's scope of services, under each original agreement with Riedhal, included attendance at six planning board meetings. (Plaintiff's Exhibit 5 at 3.) This totals eighteen such meetings for the three projects. While the Plaintiff's participation at this one planning board meeting was important, attendance at all of the meetings, culminating in planning board approval, was critical.[9]

Second, the guaranteed debt arose in connection with three different projects, but the October, 1989 meeting only concerned the American Boss project. The unpaid engineering services corresponding to that project totalled $62,203.84. (Plaintiff's Exhibit 6 at 1.) The balance of the debt—approximately $122,000.00—related to other projects, and even under the Plaintiff's *quantum meruit* theory, the Plaintiff's participation in the Washington Township Planning Board meeting did not confer any benefit on Riedhal or the Debtor in connection with the Plaintiff's engineering services on the other projects.

---

**8.** The Plaintiff maintained hourly time records, and could have produced this information at trial. (Tr. at 57.)

**9.** A planning board generally grants conditional approval initially, and the developer must satisfy the conditions before he obtains final approval.

This can take several months, and during that period, the developer must continue to work with his engineer. (Tr. at 205–06). The record does not reflect whether the planning board in this case ever granted final approval.

■ Third, the Plaintiff's theory contravenes the unambiguous language in § 523(a)(2)(A) and the inherent sequential order of the elements of fraud. This subsection excepts from discharge (1) a debt (2) for services (3) obtained by fraud. Thus, the misrepresentation must come first, the reliance second and the damage last.

The Plaintiff's damage theory ignores the sequence of events. The Plaintiff rendered its engineering services—the debt encompassed by the guarantees—before the Debtor made any implied misrepresentation. Hence, the misrepresentation could not have induced the services which underlie the guaranteed debt. The Plaintiff's only post-guarantee services consisted of preparing for and attending the October, 1989 planning board meeting, and doing some work on the two other projects. These services, however, were not covered by the guarantees, and further, the Plaintiff never proved their value.

*In re McDermott,* 139 B.R. 50, on which the Plaintiff relies, is not contrary. In that case, the debtor fraudulently incurred a debt in August 1989, but did not execute the corresponding promissory note until January 1991. The Court viewed the 1989 events and held that the obligation that arose at that time was not dischargeable. *See id.* at 53. The Court did not consider the 1991 promissory note to be a representation, and did not find that the creditor relied on it. The 1991 note was merely evidence of the earlier obligation which was the focus of the Court's decision.

■ In contrast, the Plaintiff in this case ignores the earlier contract debt and focuses on the 1989 guarantees. In this respect, the Plaintiff's claim is like one who challenges the dischargeability of a debt under a settlement agreement. Absent novation or release, courts look beyond the settlement to the underlying debt to determine its dischargeability. *See In re West,* 22 F.3d 775, 778 (7th Cir.1994); *Greenberg v. Schools,* 21 B.R. 1011, 1014 (S.D.Fla.1982), *aff'd on op. below,* 711 F.2d 152 (11th Cir.1983). A settlement does not convert a tort claim into a contract claim, *In re Guerrerio,* 143 B.R. at 611, and conversely, the payout agreement in this case did not convert the accrued contract claim into a tort claim.

## CONCLUSION

For the foregoing reasons, the Plaintiff has failed to sustain its burden of proof under 11 U.S.C. § 523(a)(2)(A), and the complaint will be dismissed. The foregoing shall constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

SETTLE JUDGMENT ON NOTICE.