**In re Arthur EKREM, Debtor.**

**Kathleen M. KUKULKA–STONE, Plaintiff,**

v.

**Arthur EKREM, Defendant.**

**Bankruptcy No. SV 93–46555–GM.**
**Adversary No. SV 93–04783–GM.**

United States Bankruptcy Court,
C.D. California.

Feb. 15, 1996.

---

Jeremy G. Schuster, Schuster & Associates, Long Beach, CA, for Debtor/Defendant.

Ron Lane, Long Beach, CA, for Plaintiff.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GERALDINE MUND, Bankruptcy Judge.

Kathleen M. Kukulka–Stone filed a complaint to declare the debt of Arthur Ekrem non-dischargeable. On July 13, 1995, the pretrial order was entered and it controls this matter. The trial was held on July 24, 25, 26, 31, August 3, 4, 7, October 26, 27 and November 30, 1995. Ron Lane appeared on behalf of plaintiff; Jeremy Schuster appeared on behalf of defendant. The Court hereby makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. Arthur Ekrem filed a petition for relief on October 15, 1993, case number LA 93–46555. This case is under Chapter 7. Arthur Ekrem was also a debtor under a no-asset Chapter 7 in case number LA 86–02818–JD, filed on February 19, 1986 and closed on November 12, 1986.

2. It is admitted that Kathleen M. Kukulka–Stone is an unsecured creditor of Ekrem's, holding a claim against him for $137,497.00.

3. Stone graduated from high school at age 16 and received her Bachelor of Arts degree in Political Science from Pepperdine University two years and three months later. At age 19 she began a Master of Public Administration Course at the University of Southern California, which she terminated just prior to completion because of a broken leg. Stone obtained a Master of Science Degree in Education from Niagara University in 1975. She received a Master of Business Administration Degree from Pepperdine University, Los Angeles, in 1983. She has taken courses in real estate from El Camino College, which included material on real estate principles, real estate law, real estate practice, and real estate appraisal. These courses were taken between 1978 and 1980.

4. Stone was licensed as a real estate salesperson in California beginning in 1978. She has held a real estate broker's license since 1991. She obtained a license to sell insurance in 1986 and has kept the license current since then. She obtained a license to sell mutual funds at some time between 1987 and 1990. In 1988 and 1989 Stone received gross commissions of about $25,000 per year for sales of five or six single family residences. This was only part-time employment.

5. Stone owns, outright or with others, more than two parcels of real estate which contain single family residences and more than two parcels of real estate which contain two duplexes on each lot. Prior to her dealings with Ekrem, Stone had no experience investing in real estate development projects.

6. Ekrem did not graduate from college. He did not go to U.S.C. Prior to the incidents in question, he held a real estate salesperson's license, which lapsed prior to 1988. He never held a real estate broker's license.

7. Ekrem never held a securities license nor an insurance license. Although he took a "crash preparatory course," he did not take the licensing examinations.

8. Ekrem worked as a loan officer for American Savings. Most of the loans that he handled were for the purchase of residential real estate. When American Savings was purchased, Ekrem remained as a loan officer for the purchasing entity.

9. Thereafter, Ekrem did some motel management. He never owned a hotel or motel.

10. After the motel management, Ekrem worked at United Business Investments for three months. Subsequently, he went to Lincoln. In 1986, he was director of marketing for a travel agency. He also worked for a mortgage brokerage firm. Ekrem has never worked for a bank.

11. Enrolled agent H. James Greenwald prepared Stone's income tax returns from 1979 to 1992. In the mid–1980s, Greenwald also prepared Ekrem's tax returns. Greenwald and Stone were involved in A.L. Williams, a multi-level insurance and investment agency. At the time that Stone met Ekrem, she was working part-time at A.L. Williams as an insurance and mutual fund representative. Greenwald also worked part-time for A.L. Williams.

12. Greenwald introduced Ekrem to Robert Koch, Regional Vice–President of A.L. Williams, and encouraged Ekrem to become affiliated with that company (which Ekrem never did). Stone became aware of Ekrem through this connection to Greenwald and Koch. The first meeting of Stone and Ekrem occurred in June 1988, at Greenwald's 40th birthday party. At that time, Stone was listening to a conversation between Ekrem and Steve Elwell about the real estate developments in which Ekrem was involved. Ekrem indicated that he was looking for investors and lenders.

13. A week or so later, there was a follow-up phone call between Ekrem and Stone, although the parties disagree on who placed the call.

14. In June, 1988, and at all times relevant to these investments, BSI was a real estate developer involved mainly in building single family residences and was Ekrem's client.

15. Ekrem started working with BSI in early 1988 and was to receive a consulting fee of between 3% and 10% for any investment money that he brought in. For a short time, BSI paid Ekrem a monthly stipend. Ekrem helped them arrange a short-term gap loan for a Northern California project and construction financing on one of the Northern California projects.

16. Rather than receive his commission at the time that the investment/loan was obtained by BSI, Ekrem agreed that he would receive 25% of the equity ownership of BSI in these specific projects.

17. Ekrem was never a shareholder in BSI, nor was he an officer or director. Ekrem never had an ownership interest in any of the BSI projects. Ekrem never invested any of his own money in BSI or any of its projects. His sole interest was a percent of the profit that BSI expected to obtain when the projects were completed and sold (Exhibits 12 and 23).

18. At the time that Ekrem obtained BSI as a client, he also operated under the following entities: Ekrem Company, TEC (The Ekrem Company), Arthur Ekrem Productions (for entertainment industry work), and Credit Repair Service. Ekrem Capital Corporation (hereinafter Ekrem Capital) was formed as a vehicle to solicit people to invest in BSI projects. Ekrem Capital had no financing and is currently suspended.

19. Throughout the relationship with Stone, Ekrem held himself out as a wealthy and successful businessman. He represented that he was a graduate of U.S.C., held various real estate and other types of licenses, owned a home in Manhattan Beach, and was considering buying a much more expensive home. He drove a variety of expensive cars, which he claimed to have owned or

created the impression that he owned. Ekrem did a variety of actions to create the facade of great wealth.

20. In actuality, Ekrem did not own any real property, owned a 1955 Chevrolet and no other cars, had invested no money in any of the BSI projects, had a cumulative income between $250,000 and $500,000 for the years 1988 through and including 1991, and had a net worth which rose from $50,000 in 1988 to a high of $225,000 in 1991.

21. Through the use of a BSI brochure and a BSI business card, which identified Ekrem as CEO/Principal, Ekrem held himself out as an owner and manager of BSI (Exhibits 24 and 25A). He also represented that Ekrem Capital was a subsidiary of BSI (Exhibit 24). He claimed in an advertisement that Arthur Ekrem Productions was affiliated with BSI and that he had offices in Los Angeles and New York. The BSI brochure, which Ekrem provided to Stone, also stated that he had served as a bank officer.

22. None of the above representations by Ekrem were true. They were created by Ekrem and used by Ekrem to induce Stone to believe that he had wealth, qualifications, and a position in BSI which did not exist. He intended for her to rely on these representations, which she did.

23. In each investment that Stone made, Ekrem stated or created the impression that the money that she was investing would be used by BSI to assist in financing the construction on the projects.

24. Ekrem deposited Stone's "investment" checks into his own bank account and used the money as living expenses. Ekrem never told her that the money was being used by him for his personal living expenses. She had no reason to know that Ekrem was using the money for his personal living expenses.

25. Had Stone known that the money was a loan to Ekrem rather than an investment in the BSI project, she would not have transferred the money to Ekrem.

### NORTHERN CALIFORNIA INVESTMENTS

26. On June 28, 1988, when Ekrem and Stone met about the first investment, he described the Willow Park Marina Project. Ekrem told Stone that financing was in place. He said that the construction loan needed to be supplemented and that she would be one of the smaller investors. He offered to guaranty her investment. He also told her that Greenwald, their mutual accountant, had invested in the project.

27. Exhibit 203 is the agreement covering this $20,000 investment. Ekrem told Stone that the agreement form was drafted by his attorney. However, in his deposition, Ekrem admitted that he drafted all the documents. This is corroborated by Bruce Ashton, Ekrem's attorney, who testified that he (Ashton) had not drafted this agreement.

28. The equity agreement states in pertinent part:

#### CAPITAL

As of the above date, Kathleen Mary Kukulka, an individual, has made the following capital acquisition of equity from Arthur Ekrem pledging monies totalling twenty thousand dollars ($20,000.00) or two equity units.

In return for this equity acquisition, Kathleen Mary Kukulka, an individual, will receive a preferred return of Arthur Ekrem's equity in Willow Park Marina. (The equity return is anticipated to be between fifty percent (50%) and one hundred percent (100% on principal investment).

#### ALLOCATION OF PROFITS

Arthur Ekrem owns twenty-five percent (25%) of total equity in Willow Park Marina. The profit will be allocated to Kathleen Mary Kukula [sic], an individual, from Arthur Ekrem as profits are paid. Proposed timeframe for total pay-out is approximately eighteen (18) to twenty-four (24) months. Profit paid to Kathleen Mary Kukula [sic], an individual, not to exceed percentage described in section II of this Agreement.

29. The agreement also states that it serves as a guaranty of principal investment.

30. The day before Stone signed Exhibit 203, Greenwald also invested with Ekrem and signed an identical document (Exhibit 100 and its attachment Exhibit A).

31. Ekrem intended Stone to believe that he was a 25% owner of the project and that he was selling her a portion of his ownership interest. Stone did believe this.

32. Ekrem told Stone that construction had already begun and would be completed within 18 months. Ekrem periodically gave Stone status updates on the project, reporting that it was going well.

33. In September, 1988, Ekrem suggested that Stone invest in the Bethel Islands project. Again, he led her to believe that he owned 25% of the project and that the project was under construction. Stone invested $25,000 into the Bethel project. The agreement (Exhibit 204) is virtually identical to the Willow Park Marina agreement (Exhibit 203).

34. In October, 1989, there was an earthquake in San Francisco. At first, Ekrem said that the projects had not been damaged. By late 1989, Ekrem told Stone that there had been major damage from the earthquake and therefore he wanted to remove her investment from the Northern California properties and move it into the Malibu Residential Housing Group project.

35. On January 8, 1990, Ekrem "reinvested" the $45,000 principal amount that Stone had given him for the Northern California projects plus a $22,000 paper profit. This "investment" was in the Malibu Residential Housing Group project (Exhibit 206). Ekrem told Stone that the $22,000 profit was based on the appreciation of the land in the Northern projects and was the amount that Stone would have received as her share of his profit had the Northern projects sold.

36. In July, 1988, Hank Zdonek, a CPA and certified fraud examiner, created a partnership between his limited partnership (Zdonek Investment Fund, Ltd. [hereafter Zdonek Fund]) and BSI. The partnership (Sandmound Shores, Ltd.) was created to develop the Willow Park Marina (Exhibit 10). Ekrem had no interest in Sandmound Shores, Ltd. nor in the Zdonek limited partnership. Under the terms of Exhibit 10, upon sale of Willow Park Marina, the profits would be distributed first to repay any loans to the partnership (there do not seem to have been any), then the Zdonek Fund would receive its $300,000 principal and a set profit of between $120,000 and $180,000, and finally BSI would be entitled to the remaining balance. Ekrem was aware of this arrangement and, in fact, had sought the investment from Zdonek on behalf of BSI.

37. The Willow Park Marina property had little, if any, improvement work done to it because BSI was unable to obtain a construction loan (Exhibit Q). In February, 1990, without the knowledge of Zdonek, BSI sold the property and received $285,000 cash and a note on Sandmound Shores, Ltd. to secure the balance of the sales price (Exhibits 60, 61, Q). Instead of paying Zdonek Fund, BSI diverted the cash to other BSI projects. Later, Zdonek took control of Sandmound Shores, Ltd. and foreclosed on the note.

38. According to Exhibit Q, as of February 15, 1990, Ekrem knew that the net profit from the sale of Willow Park Marina would be $379,000, all of which was due to the Zdonek Fund. He knew that BSI made no profit on the Willow Park Marina. Ekrem received no cash benefit from Willow Park Marina.

39. Bethel Island was lost to foreclosure after Ekrem "transferred" Stone's "investment" to Malibu. Neither BSI nor Ekrem received any profit on Bethel Island and there is evidence that the land depreciated (due to the earthquake) rather than appreciated.

### MALIBU PROJECTS

40. BSI wanted to develop a piece of property in Malibu for purposes of top line residential housing. They asked Ekrem to put together acquisition money to buy the land. BSI, either through Mark Daniels or Ekrem, approached Paul Shoop. Ekrem was instrumental in creating a partnership between BSI and the Shoops. Ekrem was also instrumental in obtaining a loan from Pep-

perdine University to allow BSI to purchase an interest in the property.

41. The first project was Malibu Residential Housing Group, Ltd. (hereinafter "Malibu Residential"). In the summer of 1989, Ekrem told Stone about this project. She went to look at the land and sought to invest. He told her that the investment was closed at that time, but it might open up later. In fact, since Ekrem was not soliciting Stone to invest in the Malibu project, the statement that it was closed was false and was to induce her to think that she was investing in the project rather than lending money to Ekrem.

42. On August 14, 1989, Stone gave Ekrem a check for $15,000, intending it as an investment in Malibu Residential.

43. As part of the agreement to invest in Malibu Residential, Stone requested that she have an option to purchase one of the homes by converting some of her equity. Ekrem led Stone to believe that BSI would discount the sale of one of the condominiums to her. Ekrem added this to the agreement. The agreement merely gives her an option to purchase, but no discount or other benefit (Exhibit 26). BSI had no knowledge of the agreement nor of Stone and there is no basis to believe that they had agreed to discount the sale of a condominium to Stone.

44. After the Malibu Residential project was created, BSI became involved in a neighboring piece of land called the Malibu Nursery project (Nursery). On August 11, 1989, BSI agreed to give Ekrem 25% of the gross profits of BSI on the Nursery project. In June 1990, after all of the Stone investments had been made, BSI agreed to give Ekrem all gross profits upon the sale of the Nursery (Exhibit 70).

45. It was the intent of BSI to work out financing for the Nursery project, which would include investment of pension funds. Ekrem therefore was involved in negotiating with the Bank of Beverly Hills to set up a methodology for investment of IRA money. On November 28, 1989, Stone transferred to Ekrem $8,884.68 of her IRA money, intending to invest it in the Nursery project. The Bank of Beverly Hills funding never developed and Stone was assessed a penalty on the IRA distribution. Ekrem reimbursed her for this penalty. Exhibit 205 is the agreement between Stone and Ekrem concerning the "investment" in the Nursery project. Except for the language which grants Stone an option toward purchase of a dwelling unit, and a hold harmless clause against the Bank of Beverly Hills, this agreement is substantially the same as Exhibit 203. Again, Ekrem guaranteed the principal investment.

46. As noted above, on January 8, 1990, Stone and Ekrem signed an "equity agreement" (Exhibit 206) which stated that Stone was transferring her equity interest in Willow Park and Bethel to Malibu Residential in the total amount of $67,000. Exhibit 206 is substantially identical to Exhibit 203, except that it also notes an option to purchase. Further, Exhibit 206 states that it replaces the prior agreements concerning Willow Park and Bethel Islands. As before, the principal is guaranteed by Ekrem.

47. On May 8, 1990, Stone made her final "investment" with Ekrem, in the amount of $20,000. This was to be part of the Malibu Residential development. The language in Exhibit 208 is slightly different. It states, in part, "[a]s of the above date, Kathleen Mary Kukulka, an individual, has purchased an equity interest in the 'Malibu Residential Housing Group Ltd.' and has made a capital acquisition from Arthur Ekrem pledging equity totalling twenty thousand dollars ($20,000.00)." The balance of the agreement is substantially similar to Exhibit 203. Again, Arthur Ekrem personally guaranteed the principal investment.

48. Neither Malibu Residential nor Nursery went forward to construction. Malibu incorporated and a building freeze was implemented. BSI borrowed $500,000 from Ventura National Bank, secured by Malibu Residential. This money was used by BSI in other projects of that corporation. Ekrem had no involvement in procuring this loan.

49. Further, BSI procured a loan for $1.5 million from Ring Financial. Ekrem assisted in obtaining this loan, which was secured by the Malibu Residential property. Again, BSI used the money in its other projects.

50. BSI defaulted on its obligation owed to the secured lender, Wave/Pepperdine. As a result, BSI deeded its interest in Malibu Residential and in Nursery to Pepperdine and/or the Shoops. Any interest that Ekrem could claim (or that Stone could claim through Ekrem) was terminated at that time. These events led to the downfall of BSI.

51. Stone transferred the following amounts of money to Ekrem based on her understanding that she was investing in the various real estate development projects identified below:

| Project | Date | Exhibit | Amount |
|---|---|---|---|
| Willow Park Marina | June 28, 1988 | 203 | $20,000 |
| Bethel Island (Sand Mound Shores, Ltd) | Sept. 6, 1988 | 204 | $25,000 |
| Malibu Residential Housing Group, Ltd. | Aug. 14, 1989 | 26 | $15,000 |
| Malibu Nursery Project/BSIIX, Ltd. | Nov. 28, 1989 | 205 | $8,884.69(IRA) |
| Reinvestment from Willow Park Marina & Bethel Island, including "profit" | Jan. 8, 1990 | 206 | $67,000 (this was not new money) |
| Malibu Residential Housing Group, Ltd. | May 8, 1990 | 208 | $20,000 |

52. Stone has recovered none of the money that she gave Ekrem.

### OTHER INVESTORS

53. Several of Ekrem's other "investors," as well as acquaintances and friends, believed that he was a successful businessman. Greenwald, Ekrem's accountant, also believed that Ekrem was extremely successful and wealthy. Ekrem's mother, Reverend Sharron Barnes, testified that Ekrem made over $2 million in salary from BSI and that he had invested $3 million in cash in the BSI Malibu project.

54. The following were among the persons who signed Equity Agreements similar to those signed by Stone. All of these "investments" were used by Ekrem for his personal living expenses. Except as noted, none of the money was returned by Ekrem:

A. Donna LaValle, a friend of Ekrem, "invested" $23,000 in Bethel Woods on January 12, 1988 (Exhibit 2). She thought that she was investing in the project, that the money would be used to build the project, and did not expect that the money would be used by Ekrem for his personal living expenses.

B. Keith Miller, a manufacturing consultant, met Ekrem through Hank Zdonek (his accountant and an investor with BSI in Willow Park Marina). Miller "invested" $30,000 in Bethel Islands on October 12, 1988 (Exhibit RR) and $35,000 in Willow Park Marina on December 29, 1988 (Exhibit SS). He believed that the money was going into the construction of the project, that this was an investment and not a loan to Ekrem. He depended on the fact that Zdonek had invested.

C. Constance Butcher, employee of Greenwald, made a joint "investment" with Greenwald of $5,000 each in Willow Park Marina on June 27, 1988 (Exhibits 100 and J). In 1990, Ekrem repaid her $3,000, but told her that he did not intend to repay Greenwald.

D. M. Norvell Young, ex-chancellor of Pepperdine University, "invested" $30,000 in Malibu Residential on September 21, 1989 (Exhibit N).

### OTHER FINDINGS

55. Ekrem had reason to believe that he would receive substantial sums of money through BSI on the sale of the properties, if there was a profit (Exhibits 23, 62, 70). Although Exhibits 62 and 70 were executed after the Stone investments, they indicate a prior understanding with BSI that Ekrem would share in the BSI profits.

56. Ekrem made representations of the status of construction on the Northern California projects. These representations may have been knowingly false. However, the testimony is confused and inconclusive, so

the Court makes no finding on these statements by Ekrem.

57. The Court did not find Ekrem credible when he testified that he told people (including Stone) of his true financial circumstances nor when he testified how he discussed with them the erroneous statements in the BSI business card and brochure.

### CONCLUSIONS OF LAW

■ 11 U.S.C. § 523(a)(2)(A) provides that a debtor is not entitled to discharge if he obtains "money, property, or services" through the use of false pretenses, false representation, or actual fraud, other than a statement respecting the debtor's financial condition. Under § 523(a)(2)(A), the plaintiff must satisfy each of the following five elements:

(1) debtor made the representations;

(2) that at the time he made them he knew they were false;

(3) that he made them with the intention and purpose of deceiving the creditor;

(4) that the creditor [justifiably] relied on such representations; and

(5) that the creditor sustained the alleged loss and damage as the proximate result of the representations having been made. *In re Britton,* 950 F.2d 602, 604 (9th Cir.1991). *Field v. Mans,* —— U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (holding that the creditor must prove justifiable reliance). The proponent must prove each element by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 290, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

### A. REPRESENTATIONS

■ A plaintiff must prove that the debtor made either false representations or nondisclosures. An actionable representation must be an assertion of a fact that is existing and ascertainable. *In re Evans,* 181 B.R. 508, 513 (Bankr.S.D.Cal.1995). Further, the representation must be material to the transaction at hand. *In re Demarest,*

176 B.R. 917, 920 (Bankr.W.D.Wash.1995). An omission of material fact is also actionable for the purposes of § 523(a)(2)(A). *Id.*

Ekrem made various express misrepresentations and omissions throughout his dealings with Stone. The following are factual misrepresentations and omissions that Ekrem made:

### 1. Relationship with BSI

■ Ekrem made factual misrepresentations about his relationship with BSI. Ekrem was, at best, a paid consultant for BSI, who eventually was to receive a percentage of BSI profits, if any, in lieu of a consulting fee. However, he touted that he was CEO/principal of BSI. Ekrem also falsely stated that he had invested substantial sums of his own money into these BSI real estate projects. His misrepresentations about his professional affiliation with BSI are material and actionable because they enabled him to persuade Stone to invest [1] in the BSI properties. *DeSantis v. Smedley,* 34 Ohio App.3d 218, 219, 517 N.E.2d 1038 (1986) (misrepresentations about one's professional affiliations are material and actionable).

### 2. Nature of Investments

Ekrem made misrepresentations and nondisclosures about the nature of the investments. Ekrem's statements and the documentation led Stone to believe that she was making real estate investments. However, in reality, Stone merely provided unsecured loans to Ekrem, who used the funds for living expenses. Yet, Ekrem convinced Stone that her funds had a direct relationship to the development of the properties. It was apparent that the completion and success of the BSI developments were not at all dependent on Stone's contributions.

The investment documents further enforced the idea that Stone was investing in real estate. The documents stated that Stone was to receive an acquisition of equity, which would entitle her to a preferred return from Ekrem's equity. As such, Stone testi-

---

1. For the sake of convenience, the transactions between Ekrem and Stone will be referred to as "investments." Similarly, the other parties who transferred money to Ekrem were not actually investing in Ekrem nor in BSI, but will be referred to as "investors" for lack of another term.

fied that she thought she was directly investing in the property and would be receiving an equity interest. However, these documents were a sham because the alleged investments were simply unsecured loans.

### 3. Investment Money Used for Living Expenses

■ Ekrem did not disclose that he was using Stone's investment money for his own living expenses. Stone and the other investors indicated, in their testimony, that they had believed that the money was going directly into the properties. This nondisclosure was material as to Ekrem's guarantees. If the truth were known, Stone would have questioned the value of the guarantees and Ekrem's entire ambiance of wealth and success. Stone probably would not have invested had she known the truth. Thus, the omission was clearly material because the omitted fact would have been important to Stone in her decision to invest. *Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

### 4. Appearance of Wealth

■ Ekrem's misrepresentations about his wealth were material and induced Stone's reliance. The appearance of wealth was instrumental in causing Stone to rely on Ekrem's personal guarantees.

■ In connection with each of the investments, Ekrem provided a personal guaranty of Stone's principal investment. The personal guarantees were memorialized in the investment documents. The giving of a personal guaranty may constitute fraud because it is an implied representation that the guarantor intends to perform and has the ability to pay. *In re Rieder,* 178 B.R. 373, 376 (Bankr.S.D.N.Y.1995).

In this case, when Ekrem provided the personal guarantees, his intent to perform and his ability to pay were conditioned on his future attainment of profit and the successful completion of the BSI projects. Ekrem did not reveal these contingencies and went to great lengths to give an appearance of wealth so that Stone believed that the guaranty had value. If Ekrem had disclosed his true financial condition and the contingencies, the guarantees would not have appeared valuable to Stone. Accordingly, it is quite likely she would not have relied on them.

Further, the guarantees were illusory promises because they were dependent on the same source of funds as were the repayments required under the equity agreements. While Stone thought there were two sources of repayment (BSI and Ekrem's own wealth), there was actually only one. The funds would have to come from a profit distribution from BSI, which was contingent on profitable sales of the development projects.

### 5. "Rollover" of Profits

■ In December 1989, Ekrem did not inform Stone that the Bethel Island property was about to be lost to foreclosure. Instead, Ekrem told Stone that she had reaped a profit of $22,000 from that investment. He then commenced to report that her profit had to be rolled over into Malibu Residential, in order to avoid adverse tax consequences. Thus, Stone's alleged interest in both Willow Park and Bethel Island, along with the illusory profit, were rolled over into the Malibu Residential project.[2] There were no profits; therefore, no rollover occurred. Thus, these representations were clearly false, induced Stone to invest further in Malibu Residential, and extended the due date of her previous investments.

■ The rollover served as a new extension of credit of the $45,000 invested under Exhibits 203 and 204. This extension of credit is actionable under § 523(a)(2)(A) because it was obtained through fraudulent misrepresentations. *In re Kim,* 163 B.R. 157, 159 (9th Cir. BAP 1994) (holding that an extension of credit is actionable even when it is not accompanied with an advance of new funds).

### 6. Materiality of Misrepresentations

■ A misrepresentation is material if a reasonable investor would consider the information to be important in his decision to

---

**2.** This transaction was documented in another "Equity Agreement."

invest. *Basic v. Levinson*, 485 U.S. at 224, 108 S.Ct. at 979. This Court finds that the nature of Ekrem's representations would be important to a reasonable investor in deciding to invest. The testimony of Stone and the other investors demonstrates that the above representations formed the basis for their decision to provide funds to Ekrem. The representations were material and thus actionable.

## B. FALSITY OF REPRESENTATION

Ekrem's testimony and the circumstances in this case demonstrate that Ekrem knew that the above representations were false at the time that he made them. For example, Ekrem knew that the statements that he was CEO/principal of BSI and that Stone was to receive an equity interest in the properties were false. He knew that he had no cash invested in these properties. He knew that there was no profit from Bethel Island to rollover into the Malibu Residential project. Additionally, he knew that he was not a man of wealth and that he was using the investors' money for living expenses. He also knew that all these statements and omissions were false and misleading.

## C. INTENT TO DECEIVE

■■■■ Intent to deceive can be established by inference from the surrounding circumstances. *Rieder*, 178 B.R. at 377. The evidence and circumstances in this case demonstrate that Ekrem acted with intent to deceive Stone. Ekrem made the misrepresentations to induce Stone to provide funds, which Ekrem diverted for his own personal use.

## D. JUSTIFIABLE RELIANCE

■■■■ The United States Supreme Court has held that the proper standard under § 523(a)(2)(A) is that of justifiable reliance. *Field v. Mans*, —— U.S. at ——, 116 S.Ct. at 437. The justifiable reliance standard is an individual standard that requires examination of the surrounding circumstances and the qualities of the particular plaintiff. *Id.* at ——, 116 S.Ct. at 444. In general, the standard does not require a duty to investigate; however, once a creditor has

reason to suspect that he is being deceived, he then has a duty to investigate. *Id.*

■■■■ The inquiry is whether the creditor justifiably relied in light of the subjective effect of the circumstances. *In re Kirsh*, 973 F.2d 1454, 1460 (9th Cir.1992). Given Stone's educational and real estate background, it appears that she might not have justifiably relied on Ekrem's misrepresentations and omissions. However, in this case, Ekrem's web of deceit provides justification for Stone's reliance.

### 1. Actual Reliance

■■■■ The plaintiff must have actually relied, before the justifiable reliance requirement can be met. *See Field v. Mans*, —— U.S. at ——, 116 S.Ct. at 444 (citing Restatement (Second) of Torts § 537 (1976)). Only after determining that actual reliance occurred does the court move on to the issue of whether the actual reliance was justified. *See id.*

■■■■ The actions of Stone demonstrate her actual reliance. Ekrem has presented no contrary evidence and therefore reliance in fact is not disputed in this case. However, Ekrem argues that Stone's reliance was not justified given her background, education and intelligence.

### 2. Justification for Reliance

■■■■ The circumstances in this case, namely the scheme of deceit, lulled Stone into relying on Ekrem's misrepresentations. The following are the circumstances that explain why Stone's reliance was justified:

#### (a) Scheme of Deception

Ekrem engaged in an elaborate scheme of deception, which was difficult to penetrate. This case was not an instance of a single misrepresentation. Ekrem created a web of misrepresentations, some of which concerned the nature of the investments and his relationship with BSI. Further, Ekrem presented a facade that he possessed wealth and financial acumen. In light of the testimony of several witnesses, the Court finds that Ekrem did in fact present a *credible* facade.

The layers of misrepresentations and Ekrem's ambiance worked together to lull Stone into relying.

Ekrem's statements concerning his role in BSI also allowed him to further his deceit. By affiliating himself with BSI, a legitimate real estate development company, Ekrem was able to exude credibility and enter into investment deals concerning the BSI properties. He stated that he was CEO/principal of BSI and presented brochures and business cards corroborating his position. Furthermore, several of the investment documents were drafted on BSI letterhead, with the notation "subsidiary of Ekrem Capital Corporation." With this panoply of paperwork, Stone did not have reason to doubt Ekrem's role in BSI.

Another of Ekrem's ploys was to personally guaranty the investments. As stated earlier, he portrayed himself as a wealthy individual to give substance to the guarantees. Ekrem consistently used guarantees to induce other investors as well.

In sum, Ekrem created a scheme that can be analogized to a play. Stone and the other investors were the unwitting actors in the play. Ekrem's charm, ambiance and props created a realistic and alluring stage for his deception. This allowed Ekrem to convince others to accept his grandiose scenario, in which he was a wealthy CEO/principal of a development company and was offering virtually risk-free investments. He ensured that all of the pieces fit together so that Stone and the others believed the scheme to be reality. Unfortunately, after the loss of a substantial sum of money, Stone realized that she had been duped by the stage setting and Ekrem's ploys.

### (b) Other Investors

 Other investors and business acquaintances of Ekrem testified that he appeared to be a credible and successful businessman. These individuals were quite sophisticated, yet they accepted Ekrem's persona and therefore his characterization of the investments. These investors also provided funds without conducting an independent investigation. Their actions demonstrate that Ekrem's statements, combined with his ambiance and tactics, was a powerful inducement to invest. Therefore, the reactions of the other parties provide corroboration that it was not preposterous for Stone to rely on Ekrem's representations. This is important because reliance is not justified if it is readily apparent to the creditor that the misrepresentations are false. *Field v. Mans,* —— U.S. at ——, 116 S.Ct. at 444 (citing Restatement (Second) of Torts § 541 cmt. a (1976)).

### (c) Role of Accountant Greenwald

The method by which Stone met Ekrem is another consideration in the analysis. In applying the justifiable reliance standard, several courts have examined the relationship between the creditor and debtor. *Kirsh,* 973 F.2d at 1455; *see also In re Malget,* 165 B.R. 933 (Bankr.S.D.Cal.1994). Initially, Stone met Ekrem, on several social occasions, through her own accountant and friend, Greenwald. Greenwald also served as Ekrem's accountant. In fact, Greenwald told Stone of Ekrem's enormous financial success.

Interestingly, although Greenwald was Ekrem's accountant, he also invested with Ekrem. Greenwald entered into an "Equity Agreement" on the Willow Park property,[3] the day before Stone's first investment. Ekrem told her that Greenwald had also invested and read her part of Greenwald's agreement. That agreement was identical to the one Stone entered into on that same property.[4] Because Greenwald acted as a conduit between Stone and Ekrem, and Stone was aware of his investment with Ekrem, Stone was lulled into foregoing the usual business formalities. Based on the foregoing, Stone had no reason to be suspicious of the purported investments or Ekrem.

### (d) Background of Stone

Stone was not an unsophisticated creditor. At the time that she invested, she held a real

---

**3.** The agreement is attached to the Declaration of Constance Butcher, referenced as Exhibit 100.

**4.** See Exhibit 203.

estate salesperson's license, among other licenses. Yet, she was not employed in the real estate industry in a full-time capacity. She had experience in small-scale investments, involving mainly single family residences. Besides Stone's training in the real estate field, Stone was also a highly-educated individual, holding various degrees. After receiving a Bachelor of Arts Degree, she obtained a Master of Science Degree in Education and a Master of Business Administration Degree.

Regardless of Stone's background, her dealings with Ekrem constituted her first experience in investing in a large-scale development project. Stone perhaps did not have sufficient sophistication to understand investing in development projects of the magnitude that Ekrem was proposing. Stone did not sufficiently comprehend whether she was investing in real estate or a partnership venture.

Stone's experience in small-scale real estate transactions did not enable her to understand the true nature of the investments. Ekrem proposed an investment in a real estate development, which could potentially constitute a sale of securities.[5] *See SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). As such, the transactions were beyond the scope of Stone's training. Knowledge in these areas would have aided Stone in realizing the inadequacy of the equity agreements and the need for more information about the investments. Stone is analogous to the plaintiff in *Campbell v. McClure*, in which the defrauded plaintiff was held to have justifiably relied because, while he had some experience, he was not sufficiently sophisticated to penetrate the tortfeasor's web of deception. *Campbell v. McClure*, 182 Cal.App.3d 806, 811, 227 Cal. Rptr. 450 (1986) (plaintiff had no prior experience in the particular type of business, which was the subject of the fraud).

Ekrem argued and put on testimony that Stone should have known that the equity agreements did not give her an interest in BSI nor in the real property. Further, Ekrem contends that Stone knew or should have known that she was buying a piece of his expectation of profits. Seen in the sharp focus of hindsight, this is certainly the case. However, the actions of the other investors, some of whom were more sophisticated than Stone or had more knowledge about Ekrem, demonstrate that it was difficult to realize the true nature of the alleged investments. Furthermore, Stone's inexperience in the field of real estate development, along with Ekrem's skilled performance, made her unable to appreciate the reality behind the transactions.

As a result, Stone did not conduct an investigation as to Ekrem's financial status, the use of her funds, or the status of the development projects. The justifiable reliance standard generally does not entail a duty to investigate. *Field v. Mans*, —— U.S. at ——, 116 S.Ct. at 444; *see also Kirsh*, 973 F.2d at 1458. A duty to investigate is imposed on a creditor by virtue of suspicious circumstances, rather than by the creditor's own background. *In re Vann*, 67 F.3d 277 (11th Cir.1995); *Field v. Mans*, —— U.S. at ——, 116 S.Ct. at 444 (the U.S. Supreme Court discussed the applicability of the duty when there are suspicious circumstances, but did not discuss whether or how the duty arises by virtue of the creditor's background).

The Court does not find that there were circumstances to arouse suspicion in Stone. Ekrem patched up any potential discrepancies and prevented Stone from discovering any "red flags." As such, Stone's failure to investigate is not fatal to her claim because the circumstances in this case lulled her into relying on Ekrem. *In re Phillips*, 804 F.2d 930 (6th Cir.1986) (holding that a lender who is both banker and attorney who failed to conduct a title search had reasonably relied in light of the circumstance that the debtor was his close friend).[6]

---

5. Because the funds were used for Ekrem's living expenses, it is apparent that the transactions did not constitute sales of securities.

6. The Sixth Circuit followed the reasonableness standard. However, the Ninth Circuit in the

*Kirsh* case states that the facts in *Phillips* satisfied the justifiable reliance standard. *See Kirsh*, 973 F.2d at 1460.

### 3. Policy Considerations

Policy considerations are relevant when applying the justifiable reliance standard. A principal goal behind bankruptcy law is to provide a fresh start. Yet, the fresh start should be afforded to the honest but unfortunate debtor. *Grogan v. Garner*, 498 U.S. at 286, 111 S.Ct. at 659. When debts are based on fraud, a competing policy must be considered—protection of fraud victims.

In this case, determining Ekrem's debt to Stone to be non-dischargeable would be consistent with the limited policy of affording a fresh start to the honest debtor. However, it is unlikely that Congress would have favored giving fraudulent debtors a fresh start over protecting victims of fraud. *Cf. id.* As such, Ekrem's fraudulent behavior most likely disqualifies him as the type of honest debtor to whom Congress intended to provide a fresh start.

### E. DAMAGES

Stone has established that her reliance on Ekrem's misrepresentations proximately caused her pecuniary loss. Reliance establishes the causal connection between Ekrem's misrepresentation and Stone's damages. See *In re Apte*, 180 B.R. 223, 230 (Bankr. 9th Cir. BAP1995) (citing *Basic v. Levinson*, 485 U.S. 224, 243, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988)). It is clear that Stone would not have provided funds if she had known the true state of affairs. In sum, the evidence demonstrates that Ekrem's representations were material and caused Stone to transfer money to him on five separate occasions.

### 1. Compensatory Damages

The measure of damages in a fraud action is "out-of-pocket" loss. This notion is codified in Cal.Civ.Code § 3343(a), which defines "out-of-pocket" loss as the "difference between the actual value of that with which the defrauded person parted and the actual value of that which he received ..." Further, the defrauded party may also recover reasonable amounts that were expended because of the deceit. *Garrett v. Perry*, 53 Cal.2d 178, 184, 346 P.2d 758 (1959).

Stone parted with funds on five separate occasions, which total the sum of $88,884.69. This amount constitutes her "out-of-pocket" loss. At no point did Stone receive a payment from Ekrem on account of her investments. Therefore, this Court will award compensatory damages in the sum of $88,884.69.

### 2. Award of Prejudgment Interest

Stone is entitled to prejudgment interest. "In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud or malice, interest may be given, in the discretion of the jury." Cal.Civ.Code § 3288. This is a case of fraud where an award of prejudgment interest is necessary to put the plaintiff in a position that she would have been in, had the fraud not occurred. This Court, as the trier of fact, has discretion to grant interest and therefore will award interest on the sums Stone parted with. *Nordahl v. State of Cal. Dep't of Real Estate*, 48 Cal.App.3d 657, 665, 121 Cal.Rptr. 794, 799 (1975).

In the Ninth Circuit, prejudgment interest is determined by the U.S. Treasury bill rate, unless the equities demand otherwise. *Blanton v. Anzalone*, 813 F.2d 1574 (9th Cir.1987). Because this is a case in which a dishonest debtor engaged in fraud, the equities justify the application of a rate other than the federal rate. Ekrem should not be rewarded with the lower federal rate because this case was litigated in a federal bankruptcy court. This Court will grant prejudgment interest at the California legal rate of 7% per annum.

Interest will be awarded from the time that Stone parted with the funds. *Nordahl*, 48 Cal.App.3d 657, 665, 121 Cal.Rptr. 794, 799 (holding that interest should accrue from the time that the defrauded party parted with his money on the basis of defendant's fraud) The legal rate of 7% interest per annum will accrue from the dates that Stone parted with her money until entry of judgment. Accordingly, prejudgment interest will be awarded as to the following five transfers: (1) interest is awarded on $20,000 from

June 28, 1988 until entry of judgment; (2) interest is awarded on $25,000 from September 6, 1988 until entry of judgment; (3) interest is awarded on $15,000 from August 14, 1989 until entry of judgment; (4) interest is awarded on $8,884.69 from November 28, 1989 until entry of judgment; (5) interest is awarded on $20,000 from May 8, 1990 until entry of judgment.

### CONCLUSION

This was a case involving a wide range of misrepresentations which induced a creditor to rely to her detriment. The scheme of the debtor was such that even a highly intelligent, well-educated and specially trained creditor's reliance was justified. In light of the foregoing, Stone has established the elements required by § 523(a)(2)(A). As such, Stone is entitled to compensatory damages in the sum of $88,884.69, prejudgment interest at the legal rate of 7% per annum, and costs. This Court finds that Ekrem's debt to Stone is non-dischargeable.