# FILED

**NOT FOR PUBLICATION**

## UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No.   SC-15-1204-FYJu |
| JOSEPH ZENOVIC, | Bk. No.   13-07230-LT7 |
| Debtor. | Adv. Pro. 13-90218-LT |
| JOSEPH ZENOVIC, | |
| Appellant, | |
| v. | **MEMORANDUM**[*] |
| MALCOLM CRUMP, as Trustee of the Malcolm A. and S'anta Lou Crump Family Trust UTD 12/10/87; S'ANTA LOU CRUMP, as Trustee of the Malcolm A. and S'anta Lou Crump Family Trust UTD 12/10/87; ANGELA CRUMP, | |
| Appellees. | |

Argued and Submitted on January 19, 2017
at San Diego, California

Filed – January 31, 2017

Appeal from the United States Bankruptcy Court
for the Southern District of California

Honorable Laura S. Taylor, Chief Bankruptcy Judge, Presiding

Appearances:     Kerry Todd Curry of Curry & Associates argued on behalf of Appellant Joseph Zenovic; Jason M. Santana argued on behalf of Appellees Malcolm A. Crump, S'anta Lou Crump, and Angela Crump.

---

     [*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, see Fed. R. App. P. 32.1, it has no precedential value, see 9th Cir. BAP Rule 8024-1.

Before: FARIS, YUN,[**] and JURY, Bankruptcy Judges.

## INTRODUCTION

Chapter 7[1] debtor Joseph Zenovic appeals from the bankruptcy court's judgment following trial determining that appellees Malcolm, S'anta Lou, and Angela Crump hold a nondischargeable claim in the amount of $266,481.64. He does not challenge the court's finding of liability or determination of nondischargeability, but rather only disputes the bankruptcy court's calculation of damages. We agree with the bankruptcy court's application of California's seven percent prejudgment interest rate, rather than the much lower federal rate. However, we hold that the bankruptcy court erred in valuing certain real property for the purpose of calculating the damages claim. Accordingly, we AFFIRM IN PART, REVERSE IN PART, and REMAND to enter judgment consistent with this decision.

## FACTUAL BACKGROUND

**A.  The Crumps and their desire to build an eldercare facility**

Malcolm and S'anta Crump, a married couple, their adult daughter, Angela, and several extended family members owned interests in an income-producing commercial property. In 2008, the family decided to sell the property, and each of the Crumps

---

[**] The Honorable Scott H. Yun, United States Bankruptcy Judge for the Central District of California, sitting by designation.

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

2

expected to receive a substantial cash distribution.

In order to replace the lost rental income, Mr. Crump, Mrs. Crump, and Angela decided to seek a replacement rental property in Ramona, California. They contacted Mrs. Crump's friend and real estate broker, Karen Clendenen. Ms. Clendenen suggested that the Crumps participate in an exchange under section 1031 of the Internal Revenue Code in order to defer capital gains taxes.

After considering several properties, Mrs. Crump shifted her focus to building and operating an eldercare facility. At this point, Ms. Clendenen introduced her to Mr. Zenovic, with whom she shared office space.

Ms. Clendenen introduced Mr. Zenovic as a general contractor with experience on projects in the Ramona area. Mr. Zenovic told Mrs. Crump that his company, Meadow Builders, owned two parcels of contiguous real property (the "Property") in Ramona totaling 1.3 acres. Mr. Zenovic represented to her that the Property was suitable for her needs and "buildable and ready to go."

After a number of meetings with Mr. Zenovic and Ms. Clendenen, the Crumps decided to purchase the Property and hire Mr. Zenovic as the general contractor to construct an eldercare facility on the Property. In fact, neither Mr. Zenovic nor Meadow Builders held a general contractor's license in the state of California.

**B.  The purchase contracts**

Ms. Clendenen represented both the Crumps and Mr. Zenovic and drafted the relevant contracts: a Vacant Land Purchase Agreement ("Purchase Agreement"), an addendum ("Addendum") to the

3

Purchase Agreement, and a second Vacant Land Purchase Agreement ("Second Purchase Agreement"). Unfortunately, she drafted the contracts ineptly.

The Purchase Agreement, which Ms. Clendenen prepared using a standard form from the California Association of Realtors, provided that the Crumps would purchase the larger of the two parcels comprising the Property for a purchase price of $641,000.

The Second Purchase Agreement identified the smaller parcel comprising the Property and a purchase price of $115,000.

The Addendum cryptically provided as follows:

Purchase price to include the following:

1. Landscape = $20,000

2. Road Improvements - $15,000

3. Furniture - $20,000

4. Sewer construction - $36,000

5. $400,000 for cost of approx. 2600 sq. ft. home

6. Lot with 2 APN #-281-452-04-00 and 281-443-17-00

There will be a separate agreement between Buyer and Seller on APN # 281-443-17-00 for $115,000 to close as part of this transaction. Seller to pay total amount toward Buyers [sic] bills (to be determined by Buyer)[.]

Buyer will be closing escrow on land only. Construction to start once escrow is closed on land. Total purchase price to be $641,000 to include construction and cost above.

The testimony at trial and the bankruptcy court's findings explain that the contracts provided for $491,000 in construction costs and $150,000 for the cost of the Property, totaling $641,000. The Crumps paid Mr. Zenovic a total of $756,000 but received an immediate refund of $115,000 less escrow fees. (This

4

was the ostensible purchase price for the smaller lot, which proceeds the Seller was to use to pay the Buyer's bills.)[2] Title to both lots would pass to the Crumps at closing, and Mr. Zenovic agreed to build a home after the closing.

## C. Mr. Zenovic's failure to construct the eldercare facility

In December 2008, the parties executed the Purchase Agreements. Escrow closed later that month, and the monies were wired into Mr. Zenovic's bank account.

Mr. Zenovic did not even begin to construct the eldercare facility. Rather, he used the Crumps' money to pay unrelated personal and business debts. By April 2009, he had depleted almost all of those funds. The bankruptcy court rejected Mr. Zenovic's attempts to explain this away, and he does not appeal this aspect of the bankruptcy court's decision.

Over the next year, Mr. Zenovic repeatedly put off the Crumps' questions regarding the start of construction. The Crumps finally learned in February 2010 that the eldercare facility could not be constructed on the Property because it was nearly impossible to obtain a sewer permit to service the Property. They discovered that, since 2006, Mr. Zenovic had attempted to obtain a sewer permit from the Ramona Municipal Water District but had failed.

In September and November 2010, the Crumps wrote to Mr. Zenovic, demanding a financial accounting, but he refused to

---

[2] The bankruptcy court questioned the propriety of this treatment. It is likely that this cash payment to the Crumps had an adverse effect on the Crumps' efforts to defer capital gains tax, but it had no adverse effect on Mr. Zenovic and therefore is not relevant to this appeal.

provide any information.

**D.    Litigation in state court and bankruptcy court**

In October 2011, the Crumps sued Mr. Zenovic, Meadow Builders, and Ms. Clendenen and her employer in San Diego Superior Court (the "State Court Action").  Their allegations against Mr. Zenovic included a fraud claim.  After nearly two years of litigating the State Court Action, and about two weeks before the start of trial, Mr. Zenovic filed his chapter 7 petition.

Around the same time, the Crumps settled with Ms. Clendenen and her employer (the "Realtor Defendants") for $498,000.  The Crumps received the settlement payment in October 2013.

The Crumps filed an adversary complaint against Mr. Zenovic on August 16, 2013, asserting that their claim was nondischargeable under §§ 523(a)(2)(A) and (a)(6).

**E.    The adversary proceeding trial and closing briefs**

The bankruptcy court conducted a six-day trial in December 2014.  Among other things, the Crumps introduced the testimony of a real estate agent who had been trying to sell the Property for a year and a half.  She testified that she had reduced the asking price several times and that it was currently offered at $79,900.  The Crumps offered no other evidence of the value of the Property at trial.

The parties filed closing briefs, in which they discussed the proper measure of damages.  The Crumps argued that the court should enter judgment totaling $264,660.05.  Their reasoning was as follows:

(1) Excluding prejudgment interest, the Crumps' out-of-

6

pocket losses totaled **$566,925.96,** which consisted of construction costs totaling $491,000, third-party payments totaling $4,925.96, and decrease in the Property's value totaling $71,000 ($150,000 purchase price minus $79,000 current value).

(2) Mr. Zenovic was entitled to a credit against his liability for the **$498,000** settlement that the Crumps received from the Realtor Defendants.

(3) The Crumps were entitled to prejudgment interest at seven percent per annum totaling **$195,743.09.** They calculated prejudgment interest in two time periods:

(a) December 2008 (closing of transaction) to October 2013 (receipt of settlement funds from the Realtor Defendants).

```
$562,000  ($491K construction costs + $71K real property)
x     7%  (interest rate per annum)
 $39,340  (interest per year (or $3,278.33 per month))


$3,278.33 (interest per month)
x      58 months (Dec. 2008 - Oct. 2013)
```
**$190,143.14 - interest accrued Dec. 2008 - Oct. 2013**

(b) November 2013 to January 2015 (entry of judgment).

```
$64,000   (damages after $562K is reduced by $498K)
x    7%   (interest rate per annum)
 $4,480   (interest per year (or $373.33 per month))

$373.33 (interest per month)
x    15 months (Nov. 2013 - Jan. 2015)
```
**$5,599.95 - interest accrued Nov. 2013 - Jan. 2015**

In sum, the Crumps added the principal damages and prejudgment interest, then subtracted the settlement credit:

```
 $566,925.96 (damages)
+$195,743.09 (prejudgment interest)
 $762,669.05
-$498,000.00 (settlement credit)
```
**$264,669.05 - total damages**

In contrast, Mr. Zenovic argued that the Crumps had been

7

fully compensated by the settlement with the Realtor Defendants and were not entitled to recover anything from him. He claimed that their damages prior to the settlement with the Realtor Defendants totaled only $376,959.24.[3] When the $498,000 settlement was subtracted, the Crumps were allegedly "ahead" by $121,040.76. Mr. Zenovic claimed that the Crumps also saved an additional $205,295 that they would have had to spend on building permits and related costs, so they were actually "ahead" by a total of $326,335.76.

Mr. Zenovic also argued that the Crumps had failed to offer evidence of the value of the Property at the time the Purchase Agreement was executed in December 2008. He said that the current value of the Property was irrelevant and that any decline in property value was due to the Great Recession and not his conduct. He further contended that the Crumps did nothing to sell the Property after deciding in late 2010 that they did not want to proceed with construction of the eldercare facility.

Mr. Zenovic did not substantively discuss the applicable prejudgment interest rate in his closing brief.

**F.    The bankruptcy court's ruling and damages award**

The bankruptcy court made an oral ruling and also issued written findings of fact and conclusions of law. It explained that the oral and written rulings should be read together.

---

[3] Mr. Zenovic claimed that the Crumps paid him $756,000 between the Purchase Agreement ($641,000) and Second Purchase Agreement ($115,000). They received the Property back (the larger parcel valued at $150,000 and the smaller parcel valued at $115,000) as well as a cash rebate of $114,040.76, for a total offset of $379,040.76. As such, he claimed that their damages were $376,959.24.

The bankruptcy court determined that Mr. Zenovic committed fraud and that the judgment was nondischargeable under § 523(a)(2)(A). It said that Mr. Zenovic misrepresented material facts, including his status as a general contractor, the status of the Property (including the sewer issues), and the status of the construction payment. It also found that Mr. Zenovic made the false statements knowingly and with an intent to deceive the Crumps and that the Crumps relied on the statements and suffered injury. The court found Mr. Zenovic's testimony not credible and rejected each of his excuses and defenses. Mr. Zenovic does not challenge any of these findings on appeal.

Regarding damages, the bankruptcy court held that the Crumps were entitled to a nondischargeable judgment in the amount of $68,925.96.[4] The court adopted the prejudgment interest calculation suggested by the Crumps in their closing brief.

The bankruptcy court utilized the California prejudgment interest rate, which was seven percent. It said that the equities supported using the higher state rate.

The bankruptcy court issued its judgment on June 19, 2015, at which time damages and prejudgment interest totaled $266,481.64.

Mr. Zenovic timely filed his notice of appeal.

## JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C.

---

[4] The court calculated the contract price minus the current value of the Property minus the settlement with the Realtor Defendants as $64,000 ($641,000 - $79,000 - $498,000 = $64,000). The court then added the $4,925.96 third-party costs for a total of $68,925.96.

9

§§ 1334 and 157(b)(1) and (2)(I). We have jurisdiction under 28 U.S.C. § 158.[5]

**ISSUES**

(1) Whether the bankruptcy court erred in determining the value of the Property for the purpose of calculating damages.

(2) Whether the bankruptcy court erred in selecting the applicable prejudgment interest rate.

**STANDARDS OF REVIEW**

We review legal issues de novo and the bankruptcy court's factual findings under a clearly erroneous standard. Village Nurseries v. Gould (In re Baldwin Builders), 232 B.R. 406, 409-10 (9th Cir. BAP 1999).

"[W]e review the legal standards used in the calculation of damages de novo." R.B. Matthews, Inc. v. Transamerica Transp. Servs., Inc., 945 F.2d 269, 272 (9th Cir. 1991) (citing Galindo v. Stoody Co., 793 F.2d 1502, 1516 (9th Cir. 1986)); see Oswalt v. Resolute Indus., Inc., 642 F.3d 856, 859-60 (9th Cir. 2011) ("We review de novo the legal conclusion that damages are available and review for clear error factual findings underlying the damages award."). De novo review is independent and gives no deference to the trial court's conclusion. Roth v. Educ. Credit Mgmt. Agency (In re Roth), 490 B.R. 908, 915 (9th Cir. BAP 2013).

We review the bankruptcy court's prejudgment interest award for abuse of discretion. Simeonoff v. Hiner, 249 F.3d 883, 894

---

[5] The BAP clerk's office determined that the judgment was interlocutory inasmuch as it did not dispose of the Crumps' § 523(a)(6) claim. Mr. Zenovic thereafter requested and obtained from the bankruptcy court a Civil Rule 54(b) determination.

(9th Cir. 2001); see von Gunten v. Neilson (In re Slatkin), 243 F. App'x 255, 259 (9th Cir. 2007) ("[t]he award of pre-judgment interest is within the sound discretion of the trial court"). To determine whether the bankruptcy court abused its discretion, we conduct a two-step inquiry: (1) we review de novo whether the bankruptcy court "identified the correct legal rule to apply to the relief requested" and (2) if it did, whether the bankruptcy court's application of the legal standard was illogical, implausible, or "without support in inferences that may be drawn from the facts in the record." United States v. Hinkson, 585 F.3d 1247, 1261-62 (9th Cir. 2009) (en banc).

We may affirm the bankruptcy court on any basis supported by the record. Heilman v. Heilman (In re Heilman), 430 B.R. 213, 216 (9th Cir. BAP 2010).

## DISCUSSION

**A. The bankruptcy court erred in determining damages when it valued the Property as of the date of trial.**

Mr. Zenovic contends that the bankruptcy court erred in its damages calculation by not valuing the Property correctly. We disagree with most of his reasoning but agree with his conclusion. The bankruptcy court valued the Property as of the trial date. Instead, the court should have valued the Property at an earlier date.

A court must award damages to sufficiently compensate the plaintiffs for out-of-pocket losses that they have suffered. Section § 3343(a) of the California Civil Code provides that a person "defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of

11

that with which the defrauded person parted and the actual value of that which he received . . . ." Cal. Civ. Code § 3343; see Ambassador Hotel Co. v. Wei-Chuan Inv., 189 F.3d 1017, 1032 (9th Cir. 1999) ("The California Legislature has specifically provided that the victim of fraud in the sale, purchase or exchange of property may recover only out-of-pocket losses plus certain additional damages[.]"); Kenly v. Ukegawa, 16 Cal. App. 4th 49, 53 n.2 (1993) ("under the out-of-pocket approach, the defrauded party receives only the difference between the value of the property received and the amount he paid").

Generally, "out-of-pocket damages are calculated as of the time of the transaction[.]" Ambassador Hotel Co., 189 F.3d at 1032; see Burkett v. J.A. Thompson & Son, 150 Cal. App. 2d 523, 527 (1957) ("He was entitled to recover the 'out-of-pocket loss,' or the difference between the price [the buyer] paid and the actual value at the time she made the purchase."). But subsequent events can sometimes illuminate the property's value at the date of the transfer:

> the plaintiff should receive as damages the difference in value between everything with which he parted and everything he received, and the statute contains nothing to show that the difference must be calculated solely on the basis of the facts existing at the time the contract was made or performed. The section must be applied realistically so as to give the defrauded person his actual out-of-pocket loss, and, where necessary to reach that result, the court must consider subsequent circumstances.

Garrett v. Perry, 53 Cal. 2d 178, 184 (1959).

In the present case, the Crumps entered into the purchase contracts with Mr. Zenovic in December 2008. The Crumps obtained title to the Property when escrow closed thirty days later. At

12

that point, the Crumps owned the Property and were free to sell or dispose of the Property as they wished. The bankruptcy court could have chosen the closing date as an appropriate date to value the Property. See Rivera v. Johnson, No. E051949, 2012 WL 831879, at *9 (Cal. Ct. App. Mar. 12, 2012) (unpublished) ("in determining whether [buyer] has suffered compensatory damages, the actual value of the property at the time of the sale is a material issue of fact").

The bankruptcy court also might reasonably have chosen a somewhat later date to more accurately compensate the Crumps for their out-of-pocket losses. For example, the bankruptcy court might have found that a reasonable person in the Crumps' position would not have sold the Property until such person realized that Mr. Zenovic was not going to build the house as promised. Such a finding could justify a later valuation date. Accord generally Garrett, 53 Cal. 2d at 184 ("section [3343] must be applied realistically so as to give the defrauded person his actual out-of-pocket loss, and, where necessary to reach that result, the court must consider subsequent circumstances"); Feckenscher v. Gamble, 12 Cal. 2d 482, 500 (1938) ("Although there was some equity in the property which plaintiff acquired in the trade at the time she actually acquired it, yet by reason of one of the misrepresentations made to her to the effect that the trust deed was not immediately due, she lost the entire property by a sale under the trust deed, so that it can reasonably be said that she actually received nothing of value from the transaction.").

Mr. Zenovic's own authority supports this view. In his opening brief, he cites the Restatement (Second) of Torts § 548A

13

in support of his argument that he is not liable for subsequent losses suffered by the Crumps. But comment b states:

> the matter misrepresented must be considered in the light of its tendency to cause those losses and the likelihood that they will follow. Thus **one who misrepresents the financial condition of a corporation in order to sell its stock will become liable to a purchaser who relies upon the misinformation for the loss that he sustains when the facts as to the finances of the corporation become generally known and as a result the value of the shares is depreciated on the market, because that is the obviously foreseeable result of the facts misrepresented.**

Restatement (Second) of Torts § 548A (1977) (emphasis added). Similarly, any decline in the value of the Property between the date of the sale and the time its deficiencies were discovered might have been a foreseeable result of his fraudulent conduct. He should not be rewarded for his deception, and a valuation date that considers the effect of his fraud might be appropriate.[6]

But here the bankruptcy court fixed the value of the Property as of the date of trial, about six years after the Crumps obtained title to the Property and long after they had realized that Mr. Zenovic was not going to do what he promised. Neither the Crumps nor the bankruptcy court explained why the

---

[6] Mr. Zenovic contends that the Property should be valued at the price specified for the land under the purchase contracts, which was $265,000. We reject this argument. Mr. Zenovic does not challenge on appeal the bankruptcy court's findings that he defrauded the Crumps by, among other things, misrepresenting the buildable status of the Property. If the Crumps had known the true status of the Property, there is every reason to think that they would not have agreed to the stipulated price. Mr. Zenovic is not entitled to the benefit of a contract price that was infected with his fraudulent misrepresentations.

14

date of trial was an appropriate date for this purpose.[7]

The danger of using an unduly late valuation date is that it might subject the defendant to liability for losses that the defendant did not cause. As a general rule, "[a] fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance." Restatement (Second) of Torts § 548A. "Pecuniary losses that could not reasonably be expected to result from the misrepresentation are, in general, not legally caused by it and are beyond the scope of the maker's liability." Id. at cmt. b. Delaying the valuation date could result in a damages award that forces the wrongdoer to compensate the victim for losses that the wrongdoer did not cause, such as declines in the general market.

Accordingly, the bankruptcy court erred when it fixed the actual value of the Property at the time of trial.

The Crumps did not present any evidence at trial of the value of the Property either at the time they received it or when they discovered Mr. Zenovic's fraud. They bore the burden of proving the amount of their damages. See Saunders v. Taylor, 42 Cal. App. 4th 1538, 1543 (Cal Ct. App. 1996). Because they failed to carry their burden to prove their damages, they are not entitled to damages for the loss in value of the Property.

---

[7] At oral argument, when asked by the Panel why the trial date was correct, counsel for the Crumps merely said that this later date benefitted Mr. Zenovic because the Property probably gained value between 2010 and the trial date. No evidence in the record supports this assertion.

15

**B. The bankruptcy court did not err in determining that the California prejudgment interest rate of seven percent was appropriate.**

Mr. Zenovic argues that the bankruptcy court erred in applying California's seven percent prejudgment interest rate, rather than the lower federal rate (which was 0.4 percent when the bankruptcy court entered its judgment). He does not challenge the imposition of prejudgment interest, but only the rate of interest that the bankruptcy court selected. Although we do not agree with all of the bankruptcy court's reasons to use the higher interest rate, we discern no abuse of discretion.[8]

The court may award prejudgment interest in consideration of the equities of the case. "Awards of pre-judgment interest are governed by considerations of fairness and are awarded when it is necessary to make the wronged party whole." Purcell v. United States, 1 F.3d 932, 942-43 (9th Cir. 1993) (citation omitted). Prejudgment interest is intended "to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered." Barnard v. Theobald, 721 F.3d 1069, 1078

---

[8] The bankruptcy court said that the federal rate was inadequate because the Crumps intended to use the Property as an income-producing eldercare facility. But there is no evidence in the record to show that the Property would have returned a profit, much less a seven percent return on investment.

The bankruptcy court also reasoned that California's strong public policy and laws against unlicensed contractors warranted the state interest rate. This is inconsistent with the Ninth Circuit's admonition that "[p]rejudgment interest is an element of compensation, not a penalty. Although a defendant's bad faith conduct may influence whether a court awards prejudgment interest, it should not influence the rate of the interest." Dishman v. UNUM Life Ins. Co. of Am., 269 F.3d 974, 988 (9th Cir. 2001).

16

(9th Cir. 2013). Whether to award prejudgment interest is in "the district court's sound discretion." Id.

The correct rate of prejudgment interest in federal court depends on the nature of the claims. "'Prejudgment interest is a substantive aspect of a plaintiff's claim, rather than a merely procedural mechanism.' . . . State law generally governs awards of prejudgment interest in diversity actions, but federal law may apply to the calculation of prejudgment interest when a substantive claim derives from federal law alone." Oak Harbor Freight Lines, Inc. v. Sears Roebuck, & Co., 513 F.3d 949, 961 (9th Cir. 2008) (quoting Sea Hawk Seafoods, Inc. v. Exxon Corp. (In re the Exxon Valdez), 484 F.3d 1098, 1101 (9th Cir. 2007)). Even in a federal question case, where the federal interest rate ordinarily applies, the court may choose a different rate if "the equities of a particular case demand a different rate.'" S.E.C. v. Platforms Wireless Int'l Corp., 617 F.3d 1072, 1099 (9th Cir. 2010) (citation omitted); see United States v. Gordon, 393 F.3d 1044, 1063 n.12 (9th Cir. 2004) ("Under federal law the rate of prejudgment interest is the Treasury Bill rate as defined in 28 U.S.C. § 1961 unless the district court finds on substantial evidence that a different prejudgment interest rate is appropriate.").

In the present case, the bankruptcy court chose to use the California rate of seven percent. We think that this rate was appropriate in this case.

Section 523 cases often require bankruptcy courts to decide both state law and federal law issues. In order to decide such a case, the bankruptcy court must first decide that the debtor owes

17

a "debt." In this case, as in most such cases, the "debt" alleged by the Crumps is entirely a creature of state law. Next, the bankruptcy court must determine whether that debt meets the standard for nondischargeability. This second question depends on federal law. But in cases based on § 523(a)(2), such as this one, the state law and federal law issues are often identical. This is so because § 523(a)(2) applies to debts for "false pretenses, a false representation, or actual fraud," and the Supreme Court has held that these terms must be given their standard common law meanings. Husky Int'l Elecs., Inc. v. Ritz, 136 S. Ct. 1581, 1586 (2016); Field v. Mans, 516 U.S. 59, 69-70 (1995). As the bankruptcy court noted, a claim under § 523(a)(2)(A) alleging fraud may be analyzed as a claim for fraud in the inducement under California law. "The elements of fraud under § 523(a)(2)(A) match the elements of common law fraud and of actual fraud under California law." Lee v. Tcast Commc'ns, Inc. (In re Jung Sup Lee), 335 B.R. 130, 136 (9th Cir. BAP 2005) (citation omitted). Thus, this case is analogous to a diversity case in which a federal court decides state law claims. In such a case, the bankruptcy court may choose to award prejudgment interest at the state law rate.

Mr. Zenovic cites several cases in which the federal court declined to utilize the state court prejudgment interest rate. However, those cases are either not binding authority or are readily distinguishable; none of them stand for the proposition that a bankruptcy court deciding a state law issue as a precursor to the underlying bankruptcy law question must use the federal prejudgment interest rate.

18

We also think that Mr. Zenovic's argument, if accepted, would create an incentive to forum shop. As Mr. Zenovic points out, the State Court Action was only about two weeks away from trial when he filed his bankruptcy petition. He says that the Crumps could have moved for relief from the automatic stay to permit the trial to go forward. He confidently asserts that the bankruptcy court would have granted that motion. He points out that, if that had all happened, the state court would have allowed prejudgment interest at the state law rate. Mr. Zenovic has more confidence in his predictive capacities than we have in ours, but his argument nicely makes the point that, if he is right, he saved himself substantial amounts of interest on a nondischargeable judgment by filing his bankruptcy case. It would be inequitable to allow Mr. Zenovic to benefit from forum shopping. See generally Kukulka-Stone v. Ekrem (In re Ekrem), 192 B.R. 982, 997 (Bankr. C.D. Cal. 1996) (the debtor "should not be rewarded with the lower federal rate because this case was litigated in a federal bankruptcy court"). In these circumstances, we think that the bankruptcy court did not abuse its discretion when it held that prejudgment interest at the federal rate would confer a windfall upon Mr. Zenovic.

**C.    The Crumps are entitled to a nondischargeable award of $164,047.82.**

We therefore accept the seven percent prejudgment interest rate but adjust the court's damages award to exclude damages for loss of property value.

Rather than remanding this issue for the bankruptcy court to recalculate the final award, we have undertaken the calculations

19

ourselves. "Most of the changes we have made involved arithmetical calculations that we could perform as easily as the trial court and a remand would necessarily have involved a waste of judicial resources." Felder v. United States, 543 F.2d 657, 671 (9th Cir. 1976) (also stating that "[t]he interests of justice and the best interest of the parties require that we recalculate the damages on the basis of the record before us and order the entry of a modified judgment"); see Six (6) Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1301, 1310 (9th Cir. 1990) ("Our exercise of this discretion [to recalculate an award prior to remand] is particularly appropriate where recalculation involves issues that we are equally situated to decide."); 28 U.S.C. § 2106 ("any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances").

The reduced award is calculated as follows using the bankruptcy court's methodology (which the Crumps originally proposed):

(1) Out-of-pocket losses: $491,000 + $4,925.96 = **$495,925.96**

(2) Prejudgment interest at 7% on $491,000 from December 2008 through October 2013: **$166,121.86**

(3) Settlement credit: **$498,000**

We apply the Realtor Defendants' settlement credit first against the principal damages (rather than the pre-October 2013 prejudgment interest), as directed by Newby v. Vroman, 11 Cal.

20

App. 4th 283 (Cal. Ct. App. 1992). In calculating prejudgment interest following a settlement with some of the defendants, the California appellate court stated, "the plaintiff is entitled to further prejudgment interest from the nonsettling defendants only **on the remaining principal balance of the judgment after its reduction by such settlement amount**." 11 Cal. App. 4th at 290 (emphasis added); see Transwest Capital, Inc. v. Cashless Concepts, Inc., No. 1:12-cv-00049-SAB, 2013 WL 4460240, at *4 (E.D. Cal. Aug. 16, 2013) (relying on Newby and subtracting the settlement amount from the principal damages amount, then calculating post-settlement prejudgment interest on the remaining principal damages).

In this case, the Realtor Defendants' settlement payment of $498,000 in October 2013 was greater than the Crumps' principal damages of $495,925.96. Accordingly, there is no principal damage award after October 2013, and we do not award prejudgment interest after that date.

Thus, the total award is calculated by adding the principal damages and the prejudgment interest, then subtracting the settlement credit:

```
  $495,925.96
+$166,121.86
  $662,047.82
-$498,000.00
 $164,047.82
```

We therefore award the Crumps $164,047.82.

**CONCLUSION**

For the reasons set forth above, the bankruptcy court did not err in awarding the Crumps seven percent prejudgment interest, but erred in determining the value of the Property.

21

Therefore, we AFFIRM IN PART, REVERSE IN PART, and REMAND to the bankruptcy court to enter judgment consistent with this decision.